IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:11-CV-470-F

AMERICAN CIVIL LIBERTIES UNION )
OF NORTH CAROLINA, )
DEAN DEBNAM, )
CHRISTOPHER HEANEY, )
SUSAN HOLLIDAY, CNM, MSN, and )
MARIA MAGHER, )
                                )
            Plaintiffs, )
                                )
                                )
                                )              **ORDER**
                 v. )
                                )
EUGENE A. CONTI, JR., in his official )
capacity as Secretary of North Carolina )
Department of Transportation, MICHAEL )
ROBERTSON, in his official capacity as )
Commissioner of the North Carolina )
Division of Motor Vehicles, and )
MICHAEL GILCHRIST, in his official )
capacity as Colonel of the North Carolina )
State Highway Patrol, )
                                )
            Defendants. )

      This matter came before the undersigned for a hearing on the Motion for Preliminary Injunction [DE-8] filed by Plaintiffs American Civil Liberties Union of North Carolina ("the ACLU-NC"), Dean Debnam, Christopher Heaney, Susan Holliday, CNM, MSN and Maria Magher (collectively, "Plaintiffs"). In the motion, Plaintiffs seek a preliminary injunction prohibiting Defendants from implementing, enforcing, or otherwise carrying out the program of administration for the issuance of "Choose Life" license plates, as provided for in Session Law 2011-392. At the hearing, Plaintiffs were represented by Katherine Lewis Parker. Defendants Eugene A. Conti and Michael Robertson, sued in their official capacities as Secretary of the

North Carolina Department of Transportation and Commissioner of the North Carolina Division of Motor Vehicles, respectively, (collectively, "the State" or "Defendants") were represented by Special Deputy Attorney General Neil Dalton.[1] The hearing concluded with the undersigned allowing Plaintiffs' Motion for Preliminary Injunction. This order memorializes and clarifies the ruling.

## I. FACTUAL BACKGROUND

On June 18, 2011, the North Carolina General Assembly passed House Bill 289, entitled "AN ACT TO AUTHORIZE THE DIVISION OF MOTOR VEHICLES TO ISSUE VARIOUS SPECIAL REGISTRATION PLATES" (hereinafter, "the Act"). Governor Beverly Perdue signed the bill into law on June 30, 2011. *See* N.C. Sess. Law 2011-392. The Act authorizes many new specialty license plates, including a plate bearing the message "Choose Life." *See* N.C. Sess. Law 2011-392 §1(b1)(39). The Act brings the total of specialty license plates authorized by the North Carolina legislature to well over 100. N.C. Sess. Law 2011-392 §(b)(1); N.C. Gen. Stat. § 20-79.4(b).[2]

Unlike many other States, North Carolina does not have a general statutory or administrative mechanism through which organizations or individuals can propose or obtain

---

[1] Plaintiffs also named Michael Gilchrist, in his official capacity as Colonel of the North Carolina Highway Patrol, as a defendant in the Verified Complaint [DE-1]. Plaintiffs later filed a Notice of Voluntary Dismissal [DE-33] as to Defendant Gilchrist.

[2] The specialty plates authorized by the North Carolina General Assembly convey a broad range of messages, from support of the Buddy Pelletier Surfing Foundation and shag dancing to litter prevention and awareness of sharing the roads with bicyclists and pedestrians. *See* N.C. Gen. Stat.§ 20-79.4(b)(23), (121), (122); N.C. Gen. Stat. § 20-81.12(b15).

2

specialty plates.[3] Rather, the only specialty plates available are those specifically authorized by the North Carolina General Assembly. *See* N.C. Gen. Stat. § 20-79 *et seq.*

The "Choose Life" license plate at issue in this suit would cost $25.00 annually in addition to the regular yearly registration fees. *See* N.C. Sess. Law 2011-392 §4(a). From this price, $15.00 of every plate sold would go to the Carolina Pregnancy Care Fellowship, a private organization which funds and supports crisis pregnancy centers in North Carolina. N.C. Sess. Law 2011-392 §§ 5, 7(b84). The funds to be collected from the "Choose Life" plate are expressly prohibited from "be[ing] distributed to any agency, organization, business, or other entity that provides, promotes, counsels, or refers to abortion." N.C. Sess. Law 2011-392 § 7(b84).

Under the provisions of the Act, if the Division of Motor Vehicles has received 300 applications for plates bearing the "Choose Life" message, it may develop the plate. N.C. Sess. Law 2011-392 § 7(b84). Plaintiffs allege that in practice, the applications are received through the Carolina Pregnancy Care Fellowship, the sole recipient of a portion of the funds from the sale of the "Choose Life" plate. Verified Compl. [DE-1] ¶ 25. Plaintiffs allege, upon information

---

[3] The exceptions to this general rule include specialty plates for certain civic organizations and for plates bearing collegiate insignia. *See* N.C. Gen. Stat. § 20-79(b)(27)(providing for specialty plates "[i]ssuable to a member of a nationally recognized civic organization whose member clubs in the State are exempt from State corporate income tax," provided that the Division of Motor Vehicles receives 300 applications for a specific civic club plate); N.C. Gen. Stat. § 20-81.12 (allowing specialty plates bearing collegiate insignia provided that the Division of Motor Vehicles receives at least 300 applications for a particular college or university's plate). The latter provision has resulted in North Carolina plates bearing the insignia of out-of-state colleges and universities, including some which could be considered academic or athletic rivals of North Carolina colleges and universities. *See* NORTH CAROLINA DIVISION OF MOTOR VEHICLES, *Collegiate Plates*, https://edmv-sp.dot.state.nc.us/sp/SpecialPlatesList?category=collegiate (last visited November 28, 2011)(offering license plates bearing the insignia of Clemson University, Perdue University, Virginia Tech, and University of Florida, among others).

3

and belief, that the Carolina Pregnancy Care Fellowship has received or will soon receive the requisite 300 applications. *Id.* ¶ 26. Once the Division of Motor Vehicles issues the "Choose Life" plate, it would be available to any interested vehicle owner in the State of North Carolina.

During the 2011 Legislative Session, various legislators proposed amendments to House Bill 289 to include another specialty plate stating: "Respect Choice" or "Trust Women. Respect Choice." Verified Compl. ¶¶ 28-31. In all, legislators made six attempts to amend the Act, accompanied by rancorous debate. Verified Compl. ¶ 32; Ex. C (recordings of various committee meetings wherein House Bill 289 and the amendments were discussed). All six of those attempts were rejected by the General Assembly.

Plaintiffs thereafter initiated this action by filing a Verified Complaint, Motion for Temporary Restraining Order, and Motion for Preliminary Injunction. The Individual Plaintiffs are registered automobile owners in the State of North Carolina who desire to purchase a license plate bearing a message expressing support for a woman's right to reproductive choice, such as "Respect Choice" or "Trust Women. Respect Choice." Verified Compl. ¶¶ 9-12. The ACLU-NC is a non-profit membership organization with the mission of defending individual freedoms embodied in the United States and North Carolina Constitutions. Verified Compl. ¶ 8. The Plaintiffs contend that by authorizing the "Choose Life" plate while rejecting a pro-choice license plate, the State has opened a state-created forum for private speech to one viewpoint alone in the public debate over abortion, in violation of Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution. Verified Compl. ¶ 3.

4

## II. STANDARD OF REVIEW

A preliminary injunction is an extraordinary interlocutory remedy, the purpose of which is to protect the status quo and prevent irreparable harm during the pendency of a lawsuit. *In re Microsoft Corp Antitrust Litig.*, 333 F.3d 517, 524-25 (4th Cir. 2003). A court, in its discretion, may issue a preliminary injunction only if the moving party clearly establishes the following factors: (1) he is likely to succeed on the merits; (2) he is likely to suffer irreparable harm in the absence of preliminary relief; (3) the balance of equities tips in his favor, and (4) an injunction is in the public interest. *Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008); *West Virginia Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292, 298 (4th Cir. 2009).

## III. ANALYSIS

Plaintiffs contend that a preliminary injunction must issue because the State, by authorizing the "Choose Life" plate while rejecting a pro-choice license plate, has engaged in impermissible viewpoint discrimination in violation of the First and Fourteenth Amendments, and this discrimination will result in irreparable harm. The State, however, argues that Plaintiffs cannot show a likelihood of success on the merits, and the motion for preliminary injunction should be denied. For the reasons stated below, the court finds that Plaintiffs have carried their burden in showing that the preliminary injunction should issue.

5

## A. Plaintiffs have shown a likelihood of success on the merits

The parties agree that the dispositive issue[4] in determining whether Plaintiffs have shown a likelihood of success on the merits is whether the "Choose Life" license plate constitutes government speech. Government speech is not subject to scrutiny under the Free Speech Clause of the First Amendment. *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467-68 (2009)(explaining that "[t]he Free Speech Clause restricts government regulation of private speech; it does not regulate government speech" and therefore "[a] government entity has the right to speak for itself" and "is entitled to say what it wishes and to select the views that it wants to express" (internal quotation marks and citations omitted)). Government regulation of *private* speech, however, is subject to the Free Speech Clause of the First Amendment. *See id.* at 469-70 (explaining that government speech restrictions of private speech in a traditional public forum, a designated public forum, or a limited public forum must be viewpoint neutral). Moreover, government restriction of hybrid speech–speech that is both private and governmental at the same time–also must be viewpoint neutral. *See Rose*, 361 F.3d at 795-99 (Michael, C. J., writing separately and concurring in judgment); *id.* at 800 (Luttig, C. J., writing separately and concurring in judgment). Accordingly, if the "Choose Life" plate at issue is government speech, Plaintiffs have no claim under the First Amendment.

---

[4] Defendants do not contest that Plaintiffs have standing and this court has jurisdiction over this matter. For the reasons stated in Judge Michael's opinion in *Planned Parenthood of South Carolina, Inc. v. Rose*, 361 F.3d 786, 789-92 (4th Cir. 2004), the court concludes that Plaintiffs have standing to challenge the provisions of Session Law 2011-392 relating to the "Choose Life" plate. The court also is satisfied that the Tax Injunction Act, 28 U.S.C. § 1341, does not deprive the court of jurisdiction. *See Choose Life Illinois, Inc. v. White*, 547 F.3d 853, 858 n.3 (7th Cir. 2008); *Arizona Life Coalition, Inc. v. Stanton*, 515 F.3d 956, 962 (9th Cir. 2008); *American Civil Liberties Union of Tenn. v. Bredesen*, 441 F.3d 370, 374 (2006).

Plaintiffs argue that the "Choose Life" plate is not pure government speech, and contend that the decisions of the Fourth Circuit Court of Appeals in *Rose* and *Sons of Confederate Veterans, Inc. v. Comm'r of Virginia Dep't of Motor* Vehicles, 288 F.3d 610 (4th Cir.) *reh'g en banc denied*, 305 F.3d 241 (4th Cir. 2002), *cert. denied* 543 U.S. 1119 (2005)("*SCV*") control the outcome here. In *SCV*, the speech at issue concerned the logo of the organization, Sons of Confederate Veterans ("SCV"), which contains the Confederate flag. The Virginia General Assembly passed a statute authorizing the issuance of a special license plate to members of the SCV, but the statute specifically prohibited the plates from bearing the emblem of the SCV because it contained the Confederate flag. *Id.* at 613. Notably, no other Virginia statute authorizing an organizational license plate contained any emblem or logo restriction. In determining whether the speech was private speech or government speech, the Fourth Circuit adopted a test which examines four non-exhaustive factors:

> (1) the central purpose of the program in which the speech in question occurs; (2) the degree of editorial control exercised by the government or private entities over the content of the speech; (3) the identity of the literal speaker; and (4) whether the government or the private entity bears the ultimate responsibility for the content of the speech.

*Id.* at 618 (internal quotation marks omitted). Applying those factors, the Fourth Circuit found that the purpose of Virginia's specialty license plate program as a whole "primarily is to produce revenue while allowing, on special plates authorized for private organizations, for the private expression of various views." *Id.* at 619. The Fourth Circuit also noted that Virginia rarely exercised editorial control over specialty plates, and that license plates implicate the private speech rights of individual vehicle owners. *Id.* at 621. Accordingly, the Fourth Circuit concluded the speech at issue–the SCV emblem to be displayed on a special license plate–was

7

private speech and therefore the logo restriction aimed at suppressing the SCV's viewpoint was impermissible discrimination in violation of the Free Speech Clause. *Id.* at 622-29.

In *Rose*, the Fourth Circuit again confronted the question of whether speech on a specialty license plate constitutes private or government speech. The facts in *Rose*, as both parties concede, are substantially similar to the case at bar: the South Carolina legislature enacted a statute authorizing a specialty license plate bearing the words "Choose Life" without authorizing a plate with a pro-choice message. 361 F.3d at 789.[5] Like the Act in the instant case, the South Carolina statute in *Rose* provided that proceeds from the sale of the "Choose Life" plate were to be distributed to the local private crisis pregnancy agencies, but not to those that performed or promoted abortion. The panel, with each judge writing separately to concur in the judgment, agreed that the South Carolina "Choose Life" plates involved aspects of both government and private speech, or in other words, were "hybrid speech." 361 F.3d at 794 (Michael, J.); *id.* at 800 (Luttig, J.); *id.* at 801 (Gregory, J.). The panel concluded that the private speech interests were substantial enough that viewpoint discrimination was prohibited.

Judge Michael, writing *Rose's* most detailed opinion, examined each of *SCV*'s four factors, and found that the first two–the purpose of the statute and the degree of editorial control exercised by the government–favored government speech. He noted that the purpose of the South Carolina statute was "specifically to promote the expression of a pro-life viewpoint" and contrasted it with *SCV* "where the purpose of the challenged law was to produce revenue while allowing for the private expression of various views." 361 F.3d at 793 (internal quotation marks

---

[5] The statute at issue in *Rose* only provided for the issuance of a "Choose Life" plate. The Act in the instant case provides for numerous other specialty license plates.

8

and alterations omitted). He also observed that unlike in *SCV*–where the license plate was sought and designed by a private organization–the "Choose Life" plate was proposed and pursued by two legislators. *Id.* This, in Judge Michael's view, amounted to complete editorial control by the State.

He found however, that the last two factors–the identity of the literal speaker and who bears ultimate responsibility for the plate–weighed in favor of private speech. As he explained:

> I note, as our court did in *SCV*, that the Supreme Court has held that even messages on standard license plates are associated at least partly with the vehicle owners. [288 F.3d] at 621; *Wooley v. Maynard*, 430 U.S. 705, 717, 97 S. Ct. 1428, 51 L. Ed.2d 752 (1977) (holding that vehicle owner had First Amendment right to cover the "Live Free or Die" motto on New Hampshire plate). This association is much stronger when the vehicle owner displays a specialty license plate. Although a specialty license plate, like a standard plate, is state-owned and bears a state-authorized message, the specialty plate gives private individuals the option to identify with, purchase, and display one of the authorized messages. Indeed, no one who sees a specialty license plate imprinted with the phrase "Choose Life" would doubt that the owner of that vehicle holds a pro-life viewpoint. The literal speaker of the Choose Life message on the specialty plate therefore appears to be the vehicle owner, not the State, just as the literal speaker of a bumper sticker message is the vehicle owner, not the producer of the bumper sticker. The same reasoning leads me to conclude (under the fourth *SCV* factor) that the private individual bears the ultimate responsibility for the speech on the Choose Life plate. Although the Choose Life plate was made available through state initiative, the private individual chooses to spend additional money to obtain the plate and to display its pro-life message on her vehicle.

*Rose*, 361 F.3d at 794.

Defendants acknowledge the holding in *Rose*, but argue that it is no longer binding precedent because the Supreme Court's decision in *Johanns v. Livestock Marketing Association*, 544 U.S. 550 (2005) effectively announced a new test for identifying government speech. In *Johanns*, a group of beef producers challenged, on First Amendment grounds, a special federal

9

assessment imposed on heads of cattle and used to fund a promotional campaign encouraging the consumption of beef (featuring the slogan "Beef. It's What's for Dinner."). The beef producers argued the federal government could not compel them to subsidize a private message, noting that the campaign was designed by private parties in the beef industry.

The Supreme Court rejected the producers' challenge, observing that "[t]he message set out in the beef promotions is from beginning to end the message established by the Federal Government." 544 U.S. at 560-61. The Court noted that the promotional program was established by Congress, and the Secretary of Agriculture implemented the program and retained ultimate authority over it. *Id.* at 561. Accordingly, the Court concluded: "When, as here, the government sets the overall message to be communicated and approves every word that is disseminated, it is not precluded from relying on the government-speech doctrine merely because it solicits assistance from nongovernmental sources in developing specific messages." *Id.* at 562. Defendants suggest that after *Johanns*, the degree of ultimate government control over a message is *the* test for what is government speech.

The court disagrees. First, the Fourth Circuit has not viewed *Johanns* as overruling *SCV* or *Rose*. It is true that in one case the Fourth Circuit stated that *Johanns* "distilled" the *SCV* factors into focusing on (1) the government's establishment of a message and (2) its effective control over the content and dissemination of the message. *Page v. Lexington County School District One*, 531 F.3d 275, 281 (4th Cir. 2008). Later opinions, however, indicate that the Fourth Circuit does not believe that the *SCV* factors are dead. In an opinion issued one month after *Page*, the Fourth Circuit explicitly utilized the *SCV* factors. *See Turner v. City Council of the City of Fredericksburg*, 534 F.3d 352, 356 (4th Cir. 2008)(explaining that the Fourth Circuit

10

had adopted the four-factor *SCV* test to determine whether speech may be attributed to the government).[6] Shortly thereafter, the Fourth Circuit in another opinion cited favorably to both *SCV* and *Rose* as support for the idea that the identity of the literal speaker is a factor supporting the finding of private or hybrid speech. *Musgrave*, 553 F.3d at 298-300 (4th Cir. 2009)(explaining that "[a]s this court recognized in [*Rose*], some speech is 'mixed' speech because it has aspects of both private speech and government speech" and noting that the identity of the literal speaker is one of four factors to consider).

Second, Defendants overlook the factual differences between the beef promotion program in *Johanns* and the specialty license plate program at bar. *Johanns* concerned a compelled subsidy: the mandatory assessment each beef producer was forced to pay to support the advertising encouraging beef consumption. The beef program was part of a government scheme to further an ostensible communal purpose. As other courts have observed, the alleged harm in *Johanns* was "being forced to give the government money to pay for someone else's message." *Bredesen*, 441 F.3d at 385 (Martin, J., dissenting). *See also White*, 547 F.3d at 863; *Stanton*, 515 F.3d at 964. Here, however, as in other specialty license plate cases, "private individuals choose to pay the price for obtaining a particular specialty license plates." *Stanton*, 515 F.3d at 964. The harm that arises in the specialty license plate context is "'being denied the opportunity to speak on the same terms as other private citizens within a government sponsored forum.'" *White*,

---

[6] The unanimous decision in *Turner* was authored by retired Associate Justice Sandra Day O'Connor, who sat on the panel by designation. Notably, Justice O'Connor voted with the majority of justices in *Johanns*. 544 U.S. at 552. Her opinion in *Turner* does not suggest that *Johanns* articulated a new catch-all test for government speech; indeed, the opinion does not cite once to *Johanns*.

11

547 F.3d at 863 (quoting *Bredesen*, 441 F.3d at 386 (Martin, J., dissenting)). As such, this court is of the opinion–shared by most of the other courts to consider the issue–that this factual distinction prevents *Johanns* from being wholly applicable in the specialty license plate context. *See Roach v. Stouffer*, 560 F.3d 860, 867 (8th Cir. 2009); *White*, 547 F.3d at 863; *Stanton*, 515 F.3d at 965; *Sons of Confederate Veterans, Florida Div., Inc. v. Atwater*, No. 6:09-cv-134-Orl-28KRS, 2011 WL 1233091 at *6 (M.D. Fla. March 30, 2011). *But see Bredesen*, 441 F.3d at 374 ("*Johanns* stands for the proposition that when the government determines an overarching message and retains the power to approve every word disseminated at its behest, the message must be attributed to the government for First Amendment purposes.").

Third, even if this court assumes that *Johanns* somehow changes the analysis used in this circuit to determine whether a message is government speech, the court does not believe a different result from *Rose* is warranted. Defendants have not suggested how to square their argument that the "Choose Life" plate constitutes pure government speech with the Supreme Court's holding in *Wooley v. Maynard*, 403 U.S. 705 (1977), where the Court held that New Hampshire violated the First Amendment rights of an objecting driver when it required him to display the state's motto "Live Free or Die" on his license plate. *Id.* at 717. If, as *Wooley* suggests, *standard* license plates implicate private speech rights because of their association with the driver of a vehicle, then specialty plates provide an even closer association. *Rose*, 361 F.3d at 794 (Michael, J.)("[T]he Supreme Court has held that even messages on standard license plates are associated at least partly with the vehicle owners" and "[t]his association is much stronger when the vehicle owner displays a specialty license plate."). *See also Choose Life Illinois*, 547 F.3d at 862-64(observing that specialty-plate messages are most closely associated with the

drivers of vehicles which bear them); *Stanton*, 515 F.3d at 956-57 (observing that most courts rely on *Wooley* to conclude that messages on license plates are private speech); *SCV*, 288 F.3d at 621 ("Importantly . . . the special plates are mounted on vehicles owned by private persons, and the Supreme Court has indicated that license plates, even when owned by the government, implicate private speech interests because of the connection of any message on the plate to the driver or owner of the vehicle."). *Cf. Bredesen*, 441 F.3d at 386(Martin, J., dissenting)(observing that an argument similar to the one advanced by the Defendants in the instant case would likely result in a different outcome in *Wooley*). Despite Defendants' arguments to the contrary, this court is of the opinion that the strong connection between a license plate and an individual owner–what may be characterized as the identity of the speaker–is still a relevant factor in determining whether the message is private or government speech.

This court's view that the identity of the speaker still remains relevant after *Johanns* is supported by the Supreme Court's latest opinion on government speech. In *Summum*,[7] the Supreme Court held that the placement of a permanent monument, designed and donated by a private entity, in a city park is a form of government speech. 555 U.S. 481. As in *Johanns*, the Court in *Summum* found the "control" factor to be important, observing that the city "'effectively controlled' the messages sent by the monuments in the [p]ark by exercising 'final approval authority' over their selection." 555 U.S. at 473 (quoting *Johanns*, 544 U.S. at 560-61). The majority opinion in *Summum*, however, did not focus *solely* on the city's editorial control over the monument. Rather, the Court also considered that monuments installed on property are

---

[7] Curiously, neither party addressed *Summum* in the briefs filed with this court, nor did they have much to say about *Summum* at the hearing.

"routinely–and reasonably–interpret[ed] as conveying some message on the property owner's behalf" and accordingly, "there is little chance that observers will fail to appreciate the identity of the speaker" as the property owner. *Id.* at 471. In light of *Summum*, this court does not view the identity of the speaker to be an irrelevant consideration.

The court also notes that the State's argument that "control" is the sole determining factor, if taken to its logical end, would allow for the State to authorize license plates bearing messages endorsing a political candidate.[8] When questioned about this proposition at the hearing in this matter, the attorney for the State replied that such license plates most likely would *not* be proper under the First Amendment. This, of course, begs the question of why a plate expressing a viewpoint on a sharply divisive and deeply emotional moral or religious controversy constitutes pure government speech but a plate endorsing a political candidate does not. The State could not articulate any rationale supporting the distinction between the two plates. The implication, nevertheless, is that some factor *other* than government control is relevant to the determination of whether a message is government speech. The court submits that other factor is the literal

---

[8] Judge Wilkinson raised the same hypothetical in his concurrence in the denial of rehearing en banc in *Rose*:
> The state is saying that its citizens may express one view on a profound controversy but not the other. Citizens are permitted to express their agreement with the officially sanctioned policy, but they have no similar outlet to express their disagreement with it. This is a presidential election year. May a state issue plates touting one candidate, but not another? It is one thing for states to use license plates to celebrate birds and butterflies, military service, historical events and scenic vistas. It is quite another for the state to privilege private speech on one side-and one side only-of a fundamental moral, religious, or political controversy.

373 F.3d at 581.

speaker of the message–in this case, the individual owner of a vehicle who makes the decision to purchase and display the license plate containing the message.

In sum, the court is of the opinion that *Rose* remains good law. For the reasons stated in the Judge Michael's opinion in *Rose*, this court preliminarily concludes that the "Choose Life" specialty license plate implicates sufficient private speech rights so as not to constitute pure government speech. *See Rose*, 361 F.3d at 794 (Michael, J.). The court also preliminarily concludes that by authorizing the "Choose Life" plate without also offering a pro-choice alternative, the State has engaged in impermissible viewpoint discrimination in violation of the First Amendment. *See id.* at 361 F.3d at 799-800. Consequently, this court finds that Plaintiffs have met their burden in establishing a likelihood of success on the merits.[9]

## B. Plaintiffs have shown a likelihood of irreparable harm

It is well-settled that a determination of likelihood of success on the merits in First Amendment cases supports a finding of irreparable harm. *See Elrod v. Burns*, 427 U.S. 347, 373 (1976)("The loss of first amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."); *Johnson v. Bergland*, 586 F.2d 993, 995 (4th Cir. 1978)("Violations of first amendment rights constitute per se irreparable injury."). Having concluded that Plaintiffs have shown a likelihood of success on the merits, the court also finds that Plaintiffs have met their burden in showing irreparable harm.

---

[9] Given the nature of this controversy, the court stresses that this case, and the court's ruling, is based on the First Amendment. "The statute's message could be reversed and the plaintiffs' position could be pro-life, not pro-choice, but the principles that govern this case would remain the same." *Rose*, 373 F.3d at 581 (Wilkinson, J., concurring in the denial of rehearing en banc).

15

## C. Plaintiffs have shown the balance of equities favors issuing the injunction

This court also must "balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (internal quotation omitted). As the court noted at the hearing, the main harm to Defendants is the temporary loss of revenue of $10 per Choose Life plate sold. After weighing this temporary loss of revenue against the constitutional harms Plaintiffs will suffer if the preliminary injunction is not issued, the court finds that the balance of equities decidedly tips in favor of issuing the injunction.

## D. Plaintiffs have shown the public interest is served by issuing the injunction

Finally, Plaintiffs must show that the requested preliminary relief would be in the public interest. *Winter*, 555 U.S. at 23. The court finds that Plaintiffs have met their burden. First, as Plaintiffs argue, the public interest is served by preventing the implementation of legislation which may infringe upon their First Amendment rights. Second, the public interest is served by avoiding potentially unnecessary administrative costs to the State and purchasing vehicle owners if the Choose Life plates are issued and sold but later deemed unconstitutional.

## E. Scope of the preliminary injunction

Plaintiffs' Motion for Preliminary Injunction seeks an order "prohibiting Defendants from implementing, enforcing, or otherwise carrying out the program of administration provided by Session Law 2011-392 Sec. 1(b1)(39), Sec. 4(a), Sec. 5(b), Sec. 7(b84)(House bill 289), or issuing the "Choose Life" plate. That is, Plaintiffs, seek to enjoin only the portions of Session Law 2011-392 related to the "Choose Life" plate.

The court may enjoin discrete provisions of a statute if those provisions are severable, a question that is answered by referring to state law. *SCV*, 288 F.3d at 627 (citing *Department of Treas. v. Fabe*, 508 U.S. 491, 509-10 (1983)). With regard to North Carolina law, the North Carolina Supreme Court has stated:

> In determining whether an unconstitutional part of a statute should be severed and the rest of the statute enforced, we look first at the intention of the General Assembly. If the legislature intended that the constitutional part of the statute be enforced after the other part has been declared unconstitutional, and if the separate parts of the statute are not so interrelated and mutually dependent that one part cannot be enforced without reference to another, the offending part must be severed and the rest of the statute enforced.

*Fulton Corp. v. Faulkner*, 345 N.C. 419, 421-22, 481 S.E.2d 8, 9 (1997).

Although there is no definitive evidence before the court–such as a severability provision–the court nevertheless finds that Session Law 2011-392, read as a whole, shows that the General Assembly intended for the remaining provisions of the law to be enforced. Session Law 2011-392 provides for approximately 70 new specialty license plates, as well as the eventual development of a standardized format for all specialty license plates. N.C. Sess. Law 2011-392 §§ 3. Common sense dictates a finding that the General Assembly intended for the vast majority of Session Law 2011-392, which is not dependent in any way upon the provisions providing for the "Choose Life" plate, to stand.

## IV. CONCLUSION

For the foregoing reasons and for the reasons stated in open court, the court finds that Plaintiffs have met their burden in showing that the preliminary injunction must issue. The court, therefore, ALLOWS Plaintiffs' Motion for Preliminary Injunction [DE-8]. It is hereby

17

ORDERED that:

(1) Defendants Eugene A. Conti, Michael Robertson, and their officers, agents, and employees are ENJOINED from implementing, enforcing, or otherwise carrying out the program of administration provided by Session Law 2011-392 Sec. 1(b1)(39), Sec. 4(a), Sec. 5(b), Sec. 7(b84)(House bill 289) or issuing the "Choose Life" plate;

(2) Plaintiffs shall post a $50,000 bond as security pursuant to Federal Rule of Civil Procedure 65(c) on or before Friday, December 16, 2011.

The Clerk of Court is DIRECTED to continue the management of this case.

SO ORDERED.

This the 8th day of December, 2011.

James C. Fox  
Senior United States District Judge