IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION
No. 5:11-CV-470-F

| | |
|---|---|
| AMERICAN CIVIL LIBERTIES UNION<br>OF NORTH CAROLINA,<br>DEAN DEBNAM,<br>CHRISTOPHER HEANEY,<br>SUSAN HOLLIDAY, CNM, MSN, and<br>MARIA MAGHER,<br><br>Plaintiffs,<br><br>v.<br><br>EUGENE A. CONTI, JR., in his official<br>capacity as Secretary of North Carolina<br>Department of Transportation, MICHAEL<br>ROBERTSON, in his official capacity as<br>Commissioner of the North Carolina<br>Division of Motor Vehicles, and<br>MICHAEL GILCHRIST, in his official<br>capacity as Colonel of the North Carolina<br>State Highway Patrol,<br><br>Defendants. | **ORDER** |

This matter is before the court on the Motion for Summary Judgment [DE-47] filed by

Plaintiffs American Civil Liberties Union of North Carolina ("the ACLU-NC"), Dean Debnam,

Christopher Heaney, Susan Holliday, CNM, MSN and Maria Magher (collectively, "Plaintiffs").

Defendants Eugene A. Conti and Michael Robertson, sued in their official capacities as Secretary

of the North Carolina Department of Transportation and Commissioner of the North Carolina

Division of Motor Vehicles, respectively, (collectively, "the State" or "Defendants")[1] timely filed

---

[1] Plaintiffs also named Michael Gilchrist, in his official capacity as Colonel of the North Carolina
Highway Patrol, as a defendant in the Verified Complaint [DE-1]. Plaintiffs later filed a Notice of
Voluntary Dismissal [DE-33] as to Defendant Gilchrist.

their Response [DE-51]. Plaintiffs have not filed a Reply, and the time for doing so has passed, so the motion is therefore now ripe for ruling.

## I. PROCEDURAL AND FACTUAL HISTORY

On June 18, 2011, the North Carolina General Assembly passed House Bill 289, entitled "AN ACT TO AUTHORIZE THE DIVISION OF MOTOR VEHICLES TO ISSUE VARIOUS SPECIAL REGISTRATION PLATES" (hereinafter, "the Act"). Governor Beverly Perdue signed the bill into law on June 30, 2011. *See* N.C. Sess. Law 2011-392. The Act authorizes many new specialty license plates, including a plate bearing the message "Choose Life." *See* N.C. Sess. Law 2011-392 §1(b1)(39). The Act brings the total number of specialty license plates authorized by the North Carolina legislature to approximately 150. N.C. Sess. Law 2011-392 §(b)(1); N.C. Gen. Stat. § 20-79.4(b).[2]

Unlike many other States, North Carolina does not have a general statutory or administrative mechanism through which organizations or individuals can propose or obtain

---

[2] The specialty plates authorized by the North Carolina General Assembly convey a broad range of messages, from support of the Buddy Pelletier Surfing Foundation and shag dancing to litter prevention and awareness of sharing the roads with bicyclists and pedestrians. *See* N.C. Gen. Stat.§ 20-79.4(b)(23), (121), (122); N.C. Gen. Stat. § 20-81.12(b15).

2

specialty plates.[3] Rather, the only specialty plates available are those specifically authorized by the North Carolina General Assembly. *See* N.C. Gen. Stat. § 20-79 *et seq.*

The "Choose Life" license plate at issue in this suit would cost $25.00 annually in addition to the regular yearly registration fees. *See* N.C. Sess. Law 2011-392 § 4(a). From this price, $15.00 of every plate sold would go to the Carolina Pregnancy Care Fellowship, a private organization which funds and supports crisis pregnancy centers in North Carolina. N.C. Sess. Law 2011-392 §§ 5, 7(b84). According to Plaintiffs, and admitted by Defendants, the Carolina Pregnancy Care Fellowship is the official state contact for Choose Life, Inc., the national organization devoted to getting the Choose Life license plates on the road in all fifty states. Verified Compl. [DE-1] ¶ 23 n.1; Answer [DE-25] ¶ 23. The funds to be collected from the "Choose Life" plate are expressly prohibited from "be[ing] distributed to any agency, organization, business, or other entity that provides, promotes, counsels, or refers to abortion." N.C. Sess. Law 2011-392 § 7(b84).

---

[3] The exceptions to this general rule include specialty plates for certain civic organizations and for plates bearing collegiate insignia. *See* N.C. Gen. Stat. § 20-79(b)(27) (providing for specialty plates "[i]ssuable to a member of a nationally recognized civic organization whose member clubs in the State are exempt from State corporate income tax," provided that the Division of Motor Vehicles receives 300 applications for a specific civic club plate); N.C. Gen. Stat. § 20-81.12 (allowing specialty plates bearing collegiate insignia provided that the Division of Motor Vehicles receives at least 300 applications for a particular college or university's plate). The latter provision has resulted in North Carolina plates bearing the insignia of out-of-state colleges and universities, including some which could be considered academic or athletic rivals of North Carolina colleges and universities. *See* NORTH CAROLINA DIVISION OF MOTOR VEHICLES, *Collegiate Plates*, https://edmv-sp.dot.state.nc.us/sp/SpecialPlatesList;jsessionid=7c30339e5e5ac66ab701592b7f13 cc732a43?category=collegiate (last visited December 5, 2012)(offering license plates bearing the insignia of Clemson University, Perdue University, Virginia Tech, and University of Florida, among others).

3

Under the provisions of the Act, if the Division of Motor Vehicles has received 300 applications for plates bearing the "Choose Life" message, it may develop the plate. N.C. Sess. Law 2011-392 § 7(b84). In practice, applications are received through the Carolina Pregnancy Care Fellowship, the sole recipient of a portion of the funds from the sale of the "Choose Life" plate. Verified Compl. [DE-1] ¶ 25; Answer [DE-25] ¶ 25. Carolina Pregnancy Care Fellowship has received the requisite 300 applications for the plate. *See* Pls.' Mem. in Supp. of Mot. for Summ. J., Ex. A [DE-49-1], at p. 19 (September 22, 2011, email from Bobbie Meyer to Angela Hatcher). Once the Division of Motor Vehicles issues the "Choose Life" plate, it would be available to any interested vehicle owner in the State of North Carolina.

During the 2011 Legislative Session, various legislators proposed amendments to House Bill 289 to include another specialty plate stating: "Respect Choice" or "Trust Women. Respect Choice." Verified Compl. ¶¶ 28-31. In all, legislators made six attempts to amend the Act, accompanied by rancorous debate. Verified Compl. ¶ 32; Ex. C (recordings of various committee meetings wherein House Bill 289 and the amendments were discussed). All six of those attempts were rejected by the General Assembly.

Plaintiffs thereafter initiated this action by filing a Verified Complaint, Motion for Temporary Restraining Order, and Motion for Preliminary Injunction. The Individual Plaintiffs are registered automobile owners in the State of North Carolina who desire to purchase a license plate bearing a message expressing support for a woman's right to reproductive choice, such as "Respect Choice" or "Trust Women. Respect Choice." Verified Compl. ¶¶ 9-12. The ACLU-NC is a nonprofit membership organization with the mission of defending individual freedoms embodied in the United States and North Carolina Constitutions. Verified Compl. ¶ 8. The

4

Plaintiffs contend that by authorizing the "Choose Life" plate while rejecting a pro-choice license plate, the State has opened a state-created forum for private speech to one viewpoint alone in the public debate over abortion, in violation of Plaintiffs' rights under the First and Fourteenth Amendments to the United States Constitution. Verified Compl. ¶ 3.

The matter came before the undersigned for a hearing on the Motion for Preliminary Injunction [DE-8] on November 28, 2011, where Plaintiffs were represented by Katherine Lewis Parker, and Defendants were represented by Special Deputy Attorney General Neil Dalton. The hearing concluded with the undersigned allowing Plaintiffs' Motion for Preliminary Injunction. On December 8, 2011, the court issued a written order [DE-36] memorializing and clarifying the ruling, and specifically preliminarily enjoined Defendants from implementing, enforcing, or otherwise carrying out the program of administration provided by Session Law 2011-392 Sec. 1(b1)(39), Sec. 4(a), Sec. 5(b), Sec. 7(b84)(House bill 289) or issuing the "Choose Life" plate.

As the court explained in its December 8, 2011, Order, the parties agreed that the dispositive issue in determining whether Plaintiffs had shown a likelihood of success on the merits was whether the "Choose Life" license plate constitutes government speech. December 8, 2011, Order [DE-8] p. 6. Government speech is not subject to scrutiny under the Free Speech Clause of the First Amendment. *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 467-68 (2009) (explaining that "[t]he Free Speech Clause restricts government regulation of private speech; it does not regulate government speech" and therefore "[a] government entity has the right to speak for itself" and "is entitled to say what it wishes and to select the views that it wants to express" (internal quotation marks and citations omitted)). Government regulation of *private* speech, however, is subject to the Free Speech Clause of the First Amendment. *See id.* at 469-70

5

(explaining that government restrictions of private speech in a traditional public forum, a designated public forum, or a limited public forum must be viewpoint neutral). Moreover, government restriction of hybrid speech–speech that is both private and governmental at the same time–also must be viewpoint neutral. *See Rose*, 361 F.3d at 795-99 (Michael, C. J., writing separately and concurring in judgment); *id.* at 800 (Luttig, C. J., writing separately and concurring in judgment). Accordingly, if the "Choose Life" plate at issue is government speech, Plaintiffs have no claim under the First Amendment.

After weighing the parties' arguments, the court concluded that the "Choose Life" license plates at issue do not constitute government speech. December 8, 2011, Order [DE-8] p. 15. In reaching this conclusion, the court agreed with Plaintiffs that the Fourth Circuit Court of Appeals' previous decisions in *Sons of Confederate Veterans, Inc. v. Comm'r of Virginia Dep't of Motor Vehicles*, 288 F.3d 610 (4th Cir.) *reh'g en banc denied*, 305 F.3d 241 (4th Cir. 2002), *cert. denied* 543 U.S. 1119 (2005)("*SCV*") and *Planned Parenthood of South Carolina, Inc. v. Rose*, 361 F.3d 786, 789-92 (4th Cir.), *reh'g en banc denied*, 373 F.3d 580 (2004), *cert. denied* 543 U.S. 1119 (2005) remained good law. *Id.* In those decisions, the Fourth Circuit used a test which examines four non-exhaustive factors to determine whether speech is private or that of the government:

> (1) the central purpose of the program in which the speech in question occurs; (2) the degree of editorial control exercised by the government or private entities over the content of the speech; (3) the identity of the literal speaker; and (4) whether the government or the private entity bears the ultimate responsibility for the content of the speech.

*Rose*, 361 F.3d at 793-94 (Michael, J.); *see also SCV*, 288 F.3d at 618. Weighing those factors, the court preliminarily concluded that for the reasons stated in Judge Michael's opinion in *Rose*,

6

the "Choose Life" specialty license plate implicates sufficient private speech rights so as not to constitute pure government speech. December 8, 2011 Order [DE-8] at p. 15 (citing *Rose*, 361 F.3d at 794 (Michael, J.)). The court also preliminarily concluded that by authorizing the "Choose Life" plate without also offering a pro-choice alternative, the State has engaged in impermissible viewpoint discrimination in violation of the First Amendment. *Id.*

In so ruling, the court rejected Defendants' argument that the Supreme Court's decision in *Johanns v. Livestock Marketing Association*, 544 U.S. 550 (2005), effectively announced a new test for identifying government speech: the control test. *Id.* at p. 10. The court reasoned that (1) the Fourth Circuit continued to use and cite to the four factors stated in *Rose* and *SCV* after the *Johanns* decision; (2) the fact that *Johanns* was a compelled subsidy case prevented it from being wholly applicable in the specialty license plate context, and (3) the Supreme Court's decision in *Wooley v. Maynard*, 403 U.S. 705 (1977), indicated that drivers had private speech rights in license plates. December 8, 2011 Order [DE-8] at pp. 10-13. Additionally, the court viewed the Supreme Court's latest decision on government speech in *Summum*–a case neither side addressed in their briefs nor had little to say about at the hearing–as supporting the idea that the identity of the speaker continues to remain relevant. December 8, 2011, Order [DE-8] at pp. 13-14.

Plaintiffs now move for summary judgment [DE-47], seeking an order permanently enjoining Defendants from issuing the "Choose Life" plate.

## II. STANDARD OF REVIEW

Summary judgment is appropriate when no genuine issues of material fact exist and the moving party is entitled to judgment as a matter of law. *See Anderson v. Liberty Lobby*, 477 U.S.

7

242, 247 (1986). The party seeking summary judgment bears the burden initially of coming forward and demonstrating the absence of a genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). When making the summary judgment determination, the facts and all reasonable inferences must be viewed in the light most favorable to the non-movant. *Liberty Lobby*, 477 U.S. at 255. Once the moving party has met its burden, the non-moving party then must come forward and demonstrate that such a fact issue does indeed exist. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). Summary judgment is appropriate against a party who fails to make a showing sufficient to establish any one of the essential elements of the party's claim on which he will bear the burden of proof at trial. *See Celotex*, 477 U.S. at 322-23.

## III. ANALYSIS

In their Memorandum in Support of the Motion for Summary Judgment [DE-49], Plaintiffs urge the court to follow *SCV* and *Rose* and find that the "Choose Life" specialty license plates constitute private or hybrid speech. In opposition, Defendants again assert that *Johanns* provides a new test for determining what constitutes government speech–the control test–and further argue that the Supreme Court confirmed the use of this test in its decision in *Summum*. According to Defendants, the application of the control test dictates a finding that the "Choose Life" license plates are speech of the State. Additionally, Defendants set forth in their Response to Plaintiff's Motion for Summary Judgment [DE-51] new reasons why *SCV* and *Rose* are no longer good law. After thoroughly considering the parties' arguments, the court again concludes that the "Choose Life" license plates at issue in this case do not constitute government speech.

8

**A. The origin and development of the government speech doctrine**

To explain how this court reaches this conclusion, a brief explanation of the origin and development of the "government speech" doctrine is necessary. "According to accepted wisdom, the government speech doctrine, as articulated by the U.S. Supreme Court, had its genesis in *Rust v. Sullivan*[, 500 U.S. 173 (1991)]." Andy G. Olree, *Identifying Government Speech*, 42 CONN. L. REV. 365, 374 (2009). In *Rust*, Congress authorized, pursuant to Title X of the Public Health Service Act, 42 U.S.C. § 300a *et seq.*, subsidies to be provided to doctors and clinics in order to advise patients on family planning topics. 500 U.S. at 179. Abortion, however, was not within the scope of Congress' approved family planning topics, and the Act specifically prohibited subsidies being provided to programs or doctors that provided abortion counseling or referrals. *Id.* at 179-80. Recipients of the federal funds under Title X challenged this restriction, arguing that the regulations passed pursuant to the Act constituted impermissible viewpoint discrimination favoring an antiabortion position over a proabortion position in the realm of family planning services. *Id.* at 192. The Supreme Court rejected the challenge, stating that "the Government had not discriminated on the basis of viewpoint; it has merely chosen to fund one activity to the exclusion of the other" and that the restrictions were merely "designed to ensure that the limits of the federal program are observed." *Id.* at 193. Rather than suppression of a viewpoint, the challenged provisions were "a prohibition on a project grantee or its employees from engaging in activities outside the program's scope." *Id.* at 194. The Supreme Court later explained the effect of its ruling in *Rust* as follows:

> The Court in *Rust* did not place explicit reliance on the rationale that the counseling activities of the doctors under Title X amounted to governmental speech; when interpreting that holding in later cases, however, we have explained *Rust* on this understanding. We have said that viewpoint-based funding decisions

9

can be sustained in instances in which the government is itself the speaker . . . or
in instances, like *Rust*, in which the government "used private speakers to transmit
specific information pertaining to its own programs." *Rosenberger v. Rector and
Visitors of Va.*, 515 U.S. 819, 833 (1995).

*Legal Servs. Corp. v. Velazquez*, 531 U.S. 533, 541 (2001) (some internal citations omitted).

Thus, the "accepted wisdom" of courts and commentators is that

the government prevailed in *Rust* because the funded speech at issue, although
conveyed by private parties, was government speech rather than private speech.
The funding rules were part of a larger government program to encourage or
discourage some private activity–in *Rust*, a program to discourage abortion and to
encourage family planning using alternative methods. The funds were allocated
so as to ensure that private speakers would "transmit specific information"–the
government's message– in support of the governmental program. The "family
planning without abortion" message was the government's own message, crafted
in advance by the government, and the funds at issue were part of a program
designed to promote that kind of family planning rather than speech in general;
therefore, the government was not required to fund messages by private speakers
expressing other viewpoints, conveying other information, or offering other
services. The viewpoint restriction could stand.

Olree, *supra* at 375 (footnotes and citations omitted). Working from this understanding of *Rust*,

the Supreme Court has stated in subsequent cases that funds raised by taxes or other measures

may "be spent for speech and expression to advocate and defend its own policies." *Bd. of

Regents of Univ. of Wisconsin Sys. v. Southworth*, 529 U.S. 217, 229 (2000) (explaining that the

Court need not reach the issue of whether the government was the speaker because the University

disclaimed the speech as its own). The Court, however, has also distinguished *Rust* in subsequent

cases where the government could not be viewed as speaking itself, but rather must be viewed as

creating a program to encourage or facilitate private speech. *See Rosenberger*, 515 U.S. at 833-

35 (striking down university's student activity fund program where the criteria for distributing

the funds were not viewpoint neutral and distinguishing *Rust* because "[t]here, the government

did not create a program to encourage private speech but instead used private speakers to

10

transmit specific information pertaining to its own program"); *Velazquez*, 531 U.S. at 542-44 (invalidating a congressional funding restriction that prohibited Legal Services Corporation ("LSC") attorneys from participating in cases attempting to reform or challenge a state or federal welfare system on the basis of viewpoint discrimination and reasoning that "the LSC program was designed to facilitate private speech, not to promote a governmental message").

Against this partial backdrop, the Supreme Court considered in *Johanns* a challenge by a group of beef producers on First Amendment grounds to a special federal assessment imposed on heads of cattle and used to fund a promotional campaign encouraging the consumption of generic beef (featuring the slogan "Beef. It's What's for Dinner."). 544 U.S. at 555-56. The promotional program was established by Congress pursuant to the Beef Promotion and Research Act of 1985 ("Beef Act"), which directs the Secretary of Agriculture to implement a policy promoting the marketing and consumption of beef. Specifically, the Secretary must appoint beef producers and importers to a "Beef Board" who, in turn, convenes an Operating Committee which designs and runs the promotional campaign, often attributed to "America's Beef Producers." 544 U.S. at 554-55. The beef producers argued the federal government could not compel them to subsidize a private message, noting that the campaign was designed by private parties in the beef industry–the members of the Beef Board's Operating Committee.

The Supreme Court rejected the producers' challenge, stating there is no First Amendment violation where there is compelled funding of government speech. *Id.* at 560. The Court concluded the promotional campaign constituted government speech, observing that "[t]he message set out in the beef promotions is from beginning to end the message established by the Federal Government." 544 U.S. at 560-61. The Court noted that the program to promote beef

11

was established by Congress, and the Secretary of Agriculture implemented the program and retained ultimate authority over it. *Id.* at 561. Accordingly, the Court concluded: "When, as here, the government sets the overall message to be communicated and approves every word that is disseminated, it is not precluded from relying on the government-speech doctrine merely because it solicits assistance from nongovernmental sources in developing specific messages." *Id.* at 562.

Subsequently, in its latest opinion concerning government speech, the Supreme Court in *Summum* held that the placement of a permanent monument, designed and donated by a private entity, in a city park does not create a forum for private expression but is instead a form of government speech. 555 U.S. at 481. The Court specifically remarked that although "[t]here may be situations in which it is difficult to tell whether a government entity is speaking on its own behalf or is providing a forum for private speech" the facts in *Summum* did not present such difficulty because "[p]ermanent monuments displayed on public property typically represent government speech." *Id.* at 470. In so concluding, the Court first took pains to note that "Governments have long used monuments to speak to the public." *Id.* Starting with the "obvious proposition that a monument that is commissioned and financed by a government body for placement on public land constitutes government speech," the Court went on to observe that monuments which are privately financed and donated to governments to be displayed on public property also constitute government speech. *Id.* at 470-71. Specifically, the Court noted that property owners rarely open up their property for installation of a monument to convey a message with which they do not agree, and for that reason, monuments installed on property are "routinely–and reasonably–interpret[ed] as conveying some message on the property owner's

12

behalf." *Id.* at 471. Accordingly, "there is little chance that observers will fail to appreciate the identity of the speaker" as the property owner. *Id.*

The Court also observed that governments have historically exercised selectivity in deciding which donated monuments to accept; because public places like parks are often closely associated with the government unit that owns the land, governments take care to "select the monuments that portray what they view as appropriate for the place in question, taking into account such content-based factors as esthetics, history and local culture." *Id.* at 472. Therefore, accepted monuments "are meant to convey and have the effect of conveying a government message, and they thus constitute government speech." *Id.* Turning to the city park and monuments at issue in *Summum*, the Court noted that government did not open up the park for just any monument which may be offered by a private donor. Instead, the city "'effectively controlled' the messages sent by the monuments in the [p]ark by exercising 'final approval authority' over their selection." 555 U.S. at 473 (quoting *Johanns*, 544 U.S. at 560-61).

## B. No one-factor test post-*Johanns* and *Summum*

Against this backdrop, Defendants argue after *Johanns* and *Summum*, the degree of ultimate government control over a message is *the* test for determining what is government speech, and the non-exclusive four factor test announced in *SCV* and applied in *Rose* is no longer good law. The court, again, disagrees. In the court's opinion, to extrapolate that control is the only factor in determining government speech is to read *Johann* and *Summum* in a vacuum, without regard to their factual underpinnings.

The speech at issue in *Johanns* was developed and disseminated pursuant to a statutorily-prescribed program to promote the marketing and consumption of beef products. In other words,

13

like many other government programs, it "involve[d], or entirely consist[ed] of, advocating a position." *Johanns*, 544 U.S. at 559 (explaining that compelled support of a government program, even one consisting entirely of promoting a specific viewpoint, is constitutional). The fact that private individuals–many of whom were appointed by the Secretary of Agriculture and all of whom must answer to the Secretary–helped design campaigns to carry out the Government's objectives did not preclude the application of the government speech doctrine. *Id.* at 561-62. This differs considerably from the specialty license plate program at issue in this case. The North Carolina General Assembly allowed for the "Choose Life" license plates in a bill which authorized approximately 70 new specialty license plates, bringing the total number of specialty license plates allowed by the General Assembly to 150. N.C. Sess. Law 2011-392 §(b)(1); N.C. Gen. Stat. § 20-79.4(b). This is not a program like *Rust* or *Johanns* with an overarching message to advocate or a policy to enforce. It is a further stretch to compare the involvement of private individuals in *Johanns* in helping design and implement a statutorily-authorized government policy with the specialty license plate program at issue here; a program that specifically advertises itself as an opportunity for North Carolina drivers to "[s]how off your Special Interest." *See* NORTH CAROLINA DIVISION OF MOTOR VEHICLES, *Special Interest Viewer*, https://edmv-sp.dot.state.nc.us/sp/demo/special_viewer_specialinterest.htm (last visited on December 5, 2012). *Cf. Rosenberger*, 515 U.S. at 833-35 (striking down university's student activity fund program where the criteria for distributing the funds were not viewpoint neutral and distinguishing *Rust* because "[t]here, the government did not create a program to encourage private speech but instead used private speakers to transmit specific information pertaining to its own program"); *Velazquez*, 531 U.S. at 542-44 (invalidating a congressional funding restriction

14

that prohibited Legal Services Corporation ("LSC") attorneys from participating in cases attempting to reform or challenge a state or federal welfare system on the basis of viewpoint discrimination and reasoning that "the LSC program was designed to facilitate private speech, not to promote a governmental message").

Moreover, although there was no overarching general message or program at issue in *Summum*, the Supreme Court, considering history and the application of common sense, concluded that when a government accepts a privately donated permanent monument and displays the monument on its land, that government–like any other property owner who were to erect a permanent monument on his property–is saying something and not creating a forum to encourage private speech. 555 U.S. at 470-73. Thus, the acceptance of monument–exercising control and final approval authority over it–was enough to establish government speech in *Summum* where the park was never opened up for the general display of monuments by private donors. *Id.* Again, the city park at issue in *Summum* was not used generally as a forum to encourage or foster private speech–unlike the specialty license plate program at issue in this case.[4]

In sum, the court does not view *Johanns* and *Summum* as announcing a new one-factor test. Rather, the court views those cases as evaluating factors the Supreme Court deemed relevant to the

---

[4] For similar reasons, the court disagrees with Defendants' assertion that *Summum* means the forum doctrine is inapplicable. *See Summum*, 555 U.S. at 478-79 (explaining that "[t]he forum doctrine has been applied in situations in which government-owned property or a government program was capable of accommodating a large number of private speakers without defeating the essential function of the land or program"). The specialty license plate program–which already has demonstrated its ability to accommodate a large variety of special interest messages–is wholly different from a public park which can only accommodate a limited number of monuments.

15

particular facts at issue in those cases, and specifically repudiating the idea that *any* involvement by private speakers prevents the application of the government speech doctrine.

**C. Analysis to be applied in this case**

Having concluded that *Summum* and *Johanns* do not announce a new, one-size fits all single factor test leads to another issue raised by Defendants: whether the four factors set forth in *SCV* should still be applied and whether the Fourth Circuit's conclusion in *Rose* remains good law.

This court previously noted that the Fourth Circuit has continued to utilize the *SCV* factors to determine whether communication is government speech. *See* December 8, 2011, Order [DE-36] at pp. 10-11 (citing *Turner v. City Council of the City of Fredericksburg*, 534 F.3d 352 (4th Cir. 2008) and *West Virginia Ass'n of Club Owners & Fraternal Servs., Inc. v. Musgrave*, 553 F.3d 292 (4th Cir. 2009)). Defendants now note, however, in the Fourth Circuit's first case concerning government speech after *Johanns*, a unanimous panel stated that, "particularly in cases involving the government's use of third-party messages," *Johanns* "distilled" the *SCV* factors to focus on two inquiries: "(1) the government's *establishment* of the message, and (2) its *effective control* over the content and dissemination of the message." *Page v. Lexington Cnty. School District One*, 531 F.3d 275, 281 (4th Cir. 2008) (citing *Johanns*, 544 U.S. at 560-62) (emphasis in original). The *Page* court then applied those two factors, and did not discuss the remaining *SCV* factors in its analysis. Defendants argue that because the Fourth Circuit later used the *SCV* factors in *Turner* and *Musgrave* without purporting to overturn any other precedent, this court must view the cases either (1) inconsistent in using different factors, in which the earlier precedent–*Page*–controls, or (2) as treating the *SCV* factors differently in different contexts, in which case the most factually similar case governs.

16

The court does not agree with Defendants' first argument. It is true that the Fourth Circuit has held that "when there is an irreconcilable conflict between opinions issued by three-judge panels of this court, the first case to decide the issue is the one that must be followed, unless and until it is overruled by this court sitting *en banc* or by the Supreme Court." *McMellon v. United States*, 387 F.3d 329, 334 (4th Cir. 2004). The court does not view, however, the Fourth Circuit's statement in *Page* and later application of other factors in *Turner* and *Musgrave* to be an "irreconcilable conflict." Rather, it reflects what this court already has addressed above: different factors will be relevant in different cases.

Nor does the court agree with Defendants' second argument: that the factual similarities between *Page* and the instant controversy dictate this court apply the only two factors used by the *Page* court. As Defendants themselves note, the *Page* court said that, "*particularly in cases involving the government's use of third-party messages,*" *Johanns* "distilled" the *SCV* factors to focus on two inquiries: government establishment of the message and its control over the content and dissemination of the message. 531 F.3d at 281 (emphasis added). In *Page*, a school board passed a resolution opposing pending voucher legislation. *Id.* at 278. The school district then communicated its views on its web site, and via emails and letters to parents and school employees, and included on its web page to links to other organizations that shared the district's opposition to the voucher legislation. *Id.* at 278-79. A citizen sued the school district after it would not let him communicate, via the school district's website and other communication channels, his support of the pending voucher legislation. *Id.* The Fourth Circuit, relying on *Johanns*, determined that although the school district's websites displayed links to other websites, the school district nonetheless had not created a "forum" but instead was engaging in dissemination of a message it had established.

17

*Id.* at 285.

Here, of course, there is not just the adopting of a third-party's message–that of the Choose Life, Inc., the national organization dedicated to obtaining the availability of "Choose Life" license plates in all 50 states. Rather, the "Choose Life" plates at issue are part of a larger program encouraging the private speech of North Carolina drivers. Again, the factual underpinnings of *Page* are quite distinguishable from the instant controversy, and the court therefore finds that *Page* does not prohibit the consideration of other relevant factors.

Moreover, even if the court accepts Defendants' arguments that portions of the *SCV* factors–namely, the focus on whom an observer may deem to be the "literal speaker"–is incompatible with the Supreme Court's refusal in *Johanns* to require that the government be expressly identifiable as the speaker, that does not mean the court cannot consider the remainder of the *SCV* factors. Nor does it require the court to reject the idea announced in *Rose* that specialty license plates can be hybrid speech. *See* 361 F.3d at 794 (Michael, J.) (finding South Carolina's "Choose Life" license plates to be "mixed speech"); *Id.* at 800 (Luttig, J.)("Needless to say, I am pleased that the court adopts today the view that speech can indeed be hybrid in character."); *Id.* at 801 (Gregory, J.) (remarking that license plate programs have elements of private and government speech).

Applying the remaining *SCV* factors to the instant case, while keeping in mind the Supreme Court's invocation or rejection of the government speech doctrine in various cases, compels this court to conclude that the "Choose Life" license plates are not purely government speech. First, with regard to the "purpose" of the relevant law at issue, common sense dictates that it is to allow North Carolina drivers to express their affinity for various special interests. As this court already

18

has observed, the passage of the bill authorized the issuance of approximately 70 different plates, bringing the total number of specialty plates to approximately 150. *See* N.C. Sess. Law 2011-392 §(b)(1); N.C. Gen. Stat. § 20-79.4(b). The State also advertises its specialty plates as an opportunity for drivers to express their special interest. *See* NORTH CAROLINA DIVISION OF MOTOR VEHICLES, *Special Interest Viewer*, https://edmv-sp.dot.state.nc.us/sp/demo/special_viewer_specialinterest.htm, (last visited on December 5, 2012). To state that the purpose of the relevant statute was to express the State's message of supporting the idea of choosing life over abortion is to ignore the larger governmental specialty license plate program as a whole.[5] This factor weighs in favor of finding the Choose Life license plates constitute private speech.

With regard to editorial control, it is undisputed that the State exercises complete editorial control over the Choose Life plates, even if the idea for the plate may have originated with the national Choose Life organization. *See Rose*, 361 F.3d at 793 (finding that South Carolina exercised complete editorial control over the content of the speech on the Choose Life plate because the legislature determined that the plate would bear the "Choose Life" message).

Finally, the last factor the court will consider–who bears ultimate responsibility for the speech–weighs in favor of finding private speech. As Judge Michael observed in the context of the South Carolina Choose Life plates, "[a]lthough the Choose Life plate was made available through state initiative, the private individual chooses to spend additional money to obtain the plate and to display its pro-life message on her vehicle." *Id.* at 794. This conclusion is buttressed by the fact that

---

[5] The court recognizes that Judge Michael, writing separately in *Rose*, did not reach this conclusion with regard to the South Carolina "Choose Life" license plate statute. 361 F.3d at 793 (finding that the purpose of the South Carolina Choose Life Act was specifically to promote the expression of a pro-life viewpoint). The court respectfully disagrees with Judge Michael as to that conclusion.

19

individual drivers specifically encouraged to show off their own special interest by purchasing a "special interest" license plate, as opposed to joining the State in spreading the State's "message."

Having weighed these factors, the court concludes, as the Fourth Circuit did in *Rose*, that sufficient private speech interests are implicated by the specialty license plates to preclude a finding of purely government speech. The court finds that this conclusion is in keeping with the common-sense notion that the North Carolina specialty license plate program as a whole, and the Choose Life plates in particular, are, at bottom, a government-sponsored avenue to encourage private speech. This court also concludes, as did each of the judges in *Rose*, that the State's offering of a Choose Life license plate in the absence of a pro-choice plate constitutes viewpoint discrimination in violation of the First Amendment. *Rose*, 361 F.3d at 799 (Michael, J.) (finding that South Carolina has engaged in viewpoint discrimination by allowing only the Choose Life plate in contravention of the First Amendment); *Id.* at 800 (Luttig, J.) (concurring in the judgment that the statute authorizing the Choose Life plate violated the First Amendment and summarizing his view that "at least where the private speech component is substantial and the government speech component less than compelling, viewpoint discrimination by the state is prohibited); *Id.* at 801 (Gregory, J.) (concurring in the judgment).

## VI. CONCLUSION

For the foregoing reasons, Plaintiffs' Motion for Summary Judgment [DE-47] is ALLOWED. It is hereby ORDERED that Defendants Eugene A. Conti, Michael Robertson, and their officers, agents, and employees are permanently ENJOINED from implementing, enforcing or otherwise carrying out the program of administration provided by Session Law 2011-392 Sec. 1(b1)(39), Sec. 4(a), Sec. 5(b), Sec. 7(b84) (House bill 289), or issuing the "Choose Life" plate. The Clerk of Court

20

is DIRECTED to close this case.

SO ORDERED.

This the 7th day of December, 2012.

James C. Fox
James C. Fox
Senior United States District Judge

21